UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

FERRING B.V., FERRING
INTERNATIONAL CENTER S.A., AND
FERRING PHARMACEUTICALS INC.,

                Plaintiffs,               12 Civ. 2650

  -against-                      OPINION

ALLERGAN, INC., ALLERGAN USA, INC.,
ALLERGAN SALES, LLC, SERENITY
PHARMACEUTICALS CORPORATION,
SERENITY PHARMACEUTICALS, LLC,
REPRISE BIOPHARMACEUTICS, LLC,
SEYMOUR H. FEIN, AND RONALD V.
NARDI,

                Defendants.

---------------------------------------X

A P P E A R A N C E S:

        <u>Attorneys for Plaintiffs</u>

        GIBBONS P.C.
        One Gateway Center
        Newark, NJ  07102
        By:  Mara E. Zazzali-Hogan, Esq.
             William P. Deni, Jr., Esq.

        FINNEGAN, HENDERSON, FARABOW, GARRETT
        & DUNNER, LLP
        901 New York Avenue, N.W.
        Washington, D.C.  20001-4413
        By:  James B. Monroe, Esq.
             Paul W. Browning, Esq.
             Adriana L. Burgy, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3 19 13

Attorneys for Defendants

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
By:  Joseph Evall, Esq.
     Scott A. Leslie, Esq.

GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612
By:  Jeffrey T. Thomas, Esq.
     Jeffrey H. Reeves, Esq.

ZUCKERMAN SPAEDER LLP
1185 Avenue of the Americas
New York, NY  10036
By:  James Sottile, Esq.
     Steven M. Cohen, Esq.
     Noah Solowiejczyk, Esq.

**Sweet, D.J.**

Defendants Allergan, Inc.; Allergan USA, Inc.; and Allergan Sales, LLC (collectively, "Allergan"); Serenity Pharmaceuticals Corporation, Serenity Pharmaceuticals, LLC (collectively, "Serenity"), Reprise Biopharmaceutics, LLC ("Reprise"), Dr. Seymour H. Fein ("Fein") and Dr. Ronald V. Nardi ("Nardi") (collectively, the "Defendants") have moved pursuant to Rules 8, 9(b), and 12(b)(6) of Federal Rules of Civil Procedure to dismiss the complaint (the "Complaint") of plaintiffs Ferring B.V., Ferring International Center S.A., and Ferring Pharmaceuticals Inc. (collectively, "Ferring" or the "Plaintiffs") alleging seventeen causes of action arising out of the obtaining and use of certain patents by the Defendants.

Based upon the conclusions set forth below, the Defendants' motion is granted as to Counts 4-17 and denied as to Counts 1-3.

I. **The Facts & Prior Proceedings**

1

Desmopressin is a synthetic hormone used to treat a variety of disorders related to excessive urine production. (See Compl. ¶¶ 27-28).

Ferring developed the world's first pharmaceutical desmopressin products, launching desmopressin in Denmark in 1972 as a treatment for central diabetes insipidus. (Id. ¶ 29).  Over the past several decades, Ferring almost singlehandedly built the current desmopressin market by leading the industry in developing novel formulations and obtaining regulatory approval to treat an increasing number of disorders.  (Id. ¶¶ 29-44). Given its efficacy, safety profile, and worldwide commercial success, Ferring markets various desmopressin products today under the Minirin® tradename and continues to conduct research and development ("R&D") on desmopressin.  (Id. ¶¶ 29, 30).

Given desmopressin's success in treating central diabetes insipidus, a Ferring affiliate in 1984 awarded Dr. Jens Peter Norgaard ("Norgaard"), then a medical doctor in Denmark, a grant to investigate the possibility of effectively treating nocturnal enuresis.  (Id. ¶ 31).  Norgaard's work established that desmopressin successfully treated children suffering from this disorder, enabling Ferring to obtain regulatory approval

2

and launch desmopressin for this purpose.  (Id.)  After becoming
an employee with a Ferring affiliate, Norgaard also led the
effort to gain regulatory approval for desmopressin as a
treatment for nocturia, further expanding the reach of
desmopressin therapy and Ferring's Minirin® products.  (Id. ¶¶
32, 33).  During the 1990s, Norgaard also investigated an
adverse side effect associated with desmopressin, hyponatremia,
in which excessive water retention causes an imbalance in blood
sodium levels.  (Id. ¶ 33).  His research into dosage levels led
him to recognize that higher doses, rather than generating a
stronger antidiuretic effect, simply extend desmopressin's
duration of action. (Id. ¶¶ 34, 35).

        Dr. Thomas Senderovitz ("Senderovitz") joined Ferring
soon thereafter to build a pharmacokinetics department and began
collaborating with Norgaard.  (Id. ¶ 35).  Senderovitz began
pooling data both from in and outside of Ferring to generate
comprehensive analyses of desmopressin's properties, known
internally as the EMF study.  (Id. ¶¶ 35, 37).  Norgaard and
Senderovitz confirmed that desmopressin was far more potent than
previously understood and that even low doses may yield maximum
antidiuretic effect, while higher doses merely extend duration
of action.  (Id. ¶¶ 35, 36).  Given these findings and the

3

understanding that higher dosages may increase the risk of hyponatremia, Norgaard and Senderovitz proposed dosages designed to achieve maximum plasma levels of approximately 6-7 pg/ml or lower, yielding a duration of six hours or less.  (Id.)  Their studies later served as a basis for Ferring clinical studies targeted at further evaluating the efficacy of low doses of desmopressin.  (Id. ¶ 38).

On August 30, 2001, Ferring decided to proceed with an orodispersible formulation project, and Senderovitz and his pharmacokinetics group developed study protocols in support of this endeavor.  (Id. at ¶ 44.)  Consistent with previous development plans considered in the 1990s, these protocols specified using the orodispersible formulation as a sublingual tablet.  (Id.)

Fein and Nardi worked together in Ferring's former Tarrytown, New York office beginning in the 1990s.  (Id. ¶ 46).  An "Employment Agreement" executed in connection with the promotion allegedly manifests Nardi's "agree[ment] to assign his ownership rights to any invention (or any improvement upon or addition to an invention) applicable to the business then being carried on by Ferring that Nardi made, discovered, or

4

participated in the discovery of" during the course of his employment.  (Id. ¶ 48).

When Nardi joined Ferring, he began working with Fein, then a consultant for Ferring.  (Id. ¶ 52.)  In 1997, Fein became an employee at Ferring with the position of Executive Director, Clinical Research and Medical Affairs.  (Id. ¶ 53.) He was an employee for just one year, however, and then resumed his consulting role.  (See id. ¶¶ 54-56.)  In 2001, while Fein was a consultant, his "duties and responsibilities . . . expanded to include assisting with developing (and potentially patenting) a desmopressin formulation."  (Id. ¶ 56.)  Fein "continued to hold himself out as Medical Director" during that period.  (Id. ¶ 59).  For most of their tenure, neither Nardi or Fein nor that office had any involvement in desmopressin R&D. (Id. ¶ 50).  After Nardi became Executive Vice President, Research and Development and Chief Scientific Officer on August 1, 2001, his responsibilities expanded to include Ferring's development of the new orodispersible desmopressin formulation. (Id. ¶¶ 47, 50).  His performance objectives and bonus criteria for 2001/2002 depended in part on obtaining patent protection for this formulation.  (Id. ¶ 50).

5

Fein became a senior management member of Ferring's high-level Research Development Marketing committee ("RMDC") (Id. ¶ 57) and began travelling to Copenhagen to attend various meetings concerning Ferring's global research and development. (Id.)  Fein also later served as the sponsor on several Ferring clinical studies, signing on Ferring's behalf and holding himself out as Medical Director, Ferring Research and Development.  (Id. ¶ 58).  Fein was one of the most highly compensated employees at Ferring in 2001 and 2002.  (Id. ¶ 60).

As of December 2001, Nardi was unaware of the status of the orodispersible study, internally designated CS004.  (Id. ¶ 51.)  When he inquired about its status, Senderovitz informed him that the protocol, specifying sublingual delivery and naming Senderovitz as study sponsor, had been completed.  (Id.)  Fein similarly did not participate in any desmopressin meetings until 2002.  (Id. ¶ 57).

Ferring filed a patent application on an orodispersible desmopressin formulation in Great Britain on May 7, 2002, without identifying any inventors, and then filed a Patent Cooperation Treaty ("PCT") application on September 20, 2002, identifying an initial set of six inventors, (Id. ¶¶ 62,

6

63), including Fein and Nardi based on their representations that they allegedly contributed the "sublingual" aspect of the orodispersible formulation. (Id. ¶ 65). With Nardi and Fein listed as inventors, Nardi could claim that he had fulfilled his performance objective of obtaining patent protection for the orodispersible desmopressin formulation. (Id. ¶ 65). In a May 2002 memorandum, Fein asserted that he made these alleged contributions jointly with Nardi and did so in the course of his regular duties at Ferring. (Id. ¶ 66).

Ferring terminated Nardi soon after the PCT filing. (See id. ¶ 67). In his severance agreement, Nardi reaffirmed that he would fulfill the post-employment obligations detailed in his August 1, 2001, employment agreement. (Id. ¶¶ 47, 48, 68, 69). He reaffirmed that he would assign his ownership rights to any inventions he made, discovered, or participated in discovering in the course of his employment. (Id. ¶ 68). He also reaffirmed that he would return all electronic and hard copy documents and materials containing information relating to Ferring's business, including trade secret and confidential information. (Id. ¶ 69). Nardi further reaffirmed that he would keep secret, at all times, information concerning Ferring's organization, business, and finances, including

7

Ferring trade secrets.  (Id.)  During his termination and
severance process, Nardi provided explicit assurances that he
was complying with his obligations and returning all of his hard
copy files and electronic documents on his home computer.  (Id.)
Ferring terminated Fein shortly thereafter on November 7, 2002,
and directed him to return all Ferring materials, including
computer files, wherever located. (Id. ¶ 70).

          Before leaving Ferring, Fein incorporated CNF Pharma,
LLC ("CNF") with Linda Cheng ("Cheng"), a consultant for
Ferring.  (Id. ¶¶ 52, 77).  Cheng, working with Maria Cheng
("Maria Cheng") at Markus Research, Inc. ("Markus"), continued
to consult for Ferring after the termination of Fein and Nardi
and to have access to confidential and trade secret Ferring
information, including the research of Norgaard and Senderovitz.
(Id. ¶ 78).  CNF and Markus have the same address:  120 North
Main Street, Suite 400, New City, New York, 10956. (Id. ¶ 80).
Fein and Cheng sought investors for the commercialization of
desmopressin (Id. ¶ 79), but kept their CNF venture and joint
activities secret from Ferring. (Id. ¶ 77).  On May 6, 2003,
Fein filed a PCT patent application (App. No. PCT/US03/14463)
claiming priority to Ferring's May 7, 2002 British application.
(See id. ¶ 74.)  Approximately six months later, he applied for

what would ultimately issue as his U.S. Patent No. 7,799,761
(the "'761 Patent"), which disclosed various pharmaceutical
compositions containing low dosages for desmopressin; he again
claimed priority to the British application.  (See id. Ex. C;
Id. ¶ 74).

        Fein filed his patent application in 2003 and
represented that his patent would be directed to some sort of
subject matter relating to sublingual desmopressin. (Id. ¶¶ 73-
74).  In 2004, in response to Ferring's inquiry, Fein's counsel
stated that these applications contained no confidential Ferring
information. Ferring now claims that Fein and Nardi used Ferring
"confidential, trade secret, proprietary, and privileged
information" to design and conduct clinical studies of
desmopressin and to obtain and commercialize patents.  (Id. ¶¶
75-76).  Fein subsequently filed a divisional application for
what would issue as U.S. Patent No. 7,405,203 (the "'203
Patent"), and a continuation application for what would issue as
U.S. Patent No. 7,579,321 (the "'321 Patent").  (See id. Exs. A,
B).  Fein assigned his interest in these applications to
defendant Reprise in 2008.  (Id. ¶¶ 84, 90).

9

Fein and Cheng approached Nardi for help in their venture and in locating potential investors by at least 2004, and Nardi began working for CNF Pharma as a consultant. (Id. ¶ 81). Fein later incorporated Serenity, located at the same address as CNF and Markus, to focus on desmopressin and seek investors, hiring Nardi as a paid consultant. (Id. ¶ 82, 83). Fein then incorporated Reprise, located at the same address as Serenity Corp., CNF, and Markus, to similarly focus on desmopressin and investors. (Id. ¶¶ 84, 85). Fein and Nardi are principals of and equity participants in Reprise, and Cheng and Maria Cheng are partners. (Id. ¶ 84). Fein assigned his rights in patent applications relating to desmopressin to Reprise. (Id. ¶ 90). In 2009, Serenity was incorporated with Fein having the title of Chief Medical Officer. (Id. ¶ 105).

When Fein obtained a patent on July 29, 2008, U.S. Patent No. 7,405,203 (the "'203 patent"), Fein's alleged invention had changed. This patent included claims directed to treatment methods involving maximum plasma concentration of lower than 10 pg/ml. (Id. ¶¶ 91, 92). He obtained a second patent on August 25, 2009, U.S. Patent No. 7,579,321, the '321 patent, also including claims involving maximum plasma

10

concentrations of lower than 10 pg/ml.  (Id. ¶¶ 94, 95).  Both patents list Fein as the sole inventor.  (Id. ¶¶ 91, 94).

On April 1, 2010, Reprise and Serenity entered into a global agreement with Allergan for the development and commercialization of SER-120, a Phase III investigational drug comprising a desmopressin formulation for intranasal administration. (Id. ¶ 106).  Despite Fein, Nardi, Cheng and Maria Cheng all having past employment at Ferring where they worked on desmopressin, none of the parties to the SER-120 agreement attempted to clear any of the claims or otherwise contact Ferring during any due diligence before the agreement. Reprise purportedly assigned the two issued patents to Allergan, as well as a pending patent application.  (Id.)  The '761 patent claimed compositions purportedly establishing plasma concentrations lower than 10 pg/ml of desmopressin.  (Id. ¶¶ 97-99).  It also lists Fein as sole inventor.  (Id. ¶ 97).

In 2011, Ferring brought entitlement proceedings against Fein and Reprise concerning a European patent application in the District Court of The Hague in the Netherlands.  In response, Allergan, Serenity, Reprise, and Fein brought patent entitlement claims against Ferring.  (Id. ¶ 107).

11

On January 11, 2012, Allergan, Serenity, Reprise, and Fein filed certain exhibits in the Netherlands proceedings alleged by Ferring to contain its confidential and trade secret information, (Id. ¶¶ 108, 109), including presentations given by Nardi to Ferring's Board of Directors that contain desmopressin EC50 data (indicating the plasma concentration at which half of the maximum clinical effect is present) developed by Norgaard and Senderovitz in the EMF study, directly illustrating the clinical effectiveness of low desmopressin plasma levels, internal minutes from high-level Ferring R&D committees with restricted distribution lists, internal Ferring emails, an entry from Nardi's Outlook calendar while at Ferring, internal Ferring R&D memoranda with confidentiality legends and a witness statement from Nardi stating that he was assisting Allergan, Serenity, Reprise, and Fein in these proceedings.  (Id. ¶ 108). The District Court of The Hague granted Ferring's request to keep those documents confidential.  (See id. ¶ 116).

On January 22, 2012, Ferring demanded that Fein, Reprise, Serenity, and Allergan withdraw their exhibits, and return all Ferring information.  (Id. ¶ 114).

12

The Complaint was filed on April 5, 2012.  On June 29, 2012, Defendants' filed the instant motion to dismiss, and the motion was heard and marked fully submitted on September 19, 2012.

## II.  **Discussion**

On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader.  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).  "'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims . . . .'"  Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929

(2007)).  Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.  Though the Court must accept the factual allegations of a complaint as true, it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  Iqbal, 129 S. Ct. at 1950 (quoting Twombly, 550 U.S. at 555).

        In addition, the expiration of the statute of limitations is an affirmative defense under which the defendant bears the burden of proof.  Fed. R. Civ. P. 8(c).  With regard to motions to dismiss based on a statute of limitations defense, "[a]lthough the triggering of inquiry notice is an issue 'often inappropriate for resolution on a motion to dismiss,' where 'the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint, resolution of the issue on a motion to dismiss is appropriate.'"  Masters v. GlaxoSmithKline, 271 Fed. Appx. 46, 48 (2d Cir. 2008) (citation omitted); see also Dodds v. Cigna Secs., Inc., 12 F.3d 346, 352 n.3 (2d Cir. 1993) (noting the "vast number of cases in this circuit resolving [notice] issues at the pleading stage.").

## A) Counts 1-3 (Inventorship Claims) Are Not Barred By Laches

Unacceptable neglect or delay in promptly asserting a claim for relief, if such neglect or delay causes prejudice to the adverse party, invokes the doctrine of laches, barring enforcement.  See A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028-29 (Fed. Cir. 1992).  "To prevail on a defense of laches, a defendant must establish that (1) the plaintiff's delay in filing a suit was 'unreasonable and inexcusable,' and (2) the defendant suffered 'material prejudice attributable to the delay.'" Hor v. Chu, 699 F.3d 1331, 1334 (Fed. Cir. 2012) (quoting A.C. Aukerman, 960 F.2d at 1028).

A delay of more than six years "after the omitted inventor knew or should have known of the issuance of the patent will produce a rebuttable presumption of laches." Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys. Inc., 988 F.2d 1157, 1163 (Fed. Cir. 1993); see also Moore v. Broadcom Corp., No. C06-05647 MJJ, 2008 WL 425932, at *3 (N.D. Cal. Feb. 12, 2008) (stating that the factors giving rise to laches "are presumed upon proof that the [allegedly omitted inventor] delayed filing suit for more than six years after actual or

15

constructive knowledge of the claim."). "With the presumption, the facts of unreasonable delay and prejudice must be inferred, absent rebuttal evidence." Mahmood v. Research in Motion Ltd., No. 11 Civ. 5345 (KBF), 2012 WL 242836, at *7 (citing to A.C. Aukerman, 960 F.2d at 1937).

The application of laches "is committed to the sound discretion of the district court." Serdarevic v. Advanced Med. Optics, Inc., 532 F.3d 1352, 1358 (Fed. Cir. 2008). Courts have found that "when the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar, a court may consider the defense on a motion to dismiss." Lennon v. Seaman, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999).

According to the Complaint, Ferring notified Fein in early 2003 that it was removing Fein and Nardi as inventors from its patent filings because their contributions were "unpatentable" (see Compl. ¶¶ 71-72). On April 17, 2003, Fein's counsel responded that Fein would pursue "his own patent application" on "subject matter relating to sublingual desmopressin with alleged low dosage possibilities." (See id. ¶

16

73; Reeves Decl. Ex. 4 (4/17/2003 Email from W. Speranza to P. Barclay)).

According to the Defendants, Ferring had "actual notice" of this correspondence and "relied upon these documents in framing the complaint." (Def. Memo. at 7 n. 5) (citing Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991); Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002) (contracts relied upon by plaintiff in drafting complaint may be considered on Rule 12(b)(6) motion)). They contend that Ferring has not challenged the use of the correspondence and therefore may consider it on its motion to dismiss.

Specifically, in a letter dated December 9, 2004, Ferring's counsel raised "concerns that Fein's patent application might include confidential Ferring data." (See Compl. ¶ 75; Reeves Decl. Ex. 5 (4/29/2003 Letter from P. Barclay to W. Speranza)). Ferring's general counsel acknowledged that she had "noted the publication of PCT/ US 2003/014463 entitled "Pharmaceutical composition including low dosages of desmopressin." Id. Ferring's counsel also stated that "Ferring will take all necessary steps to protect its

17

rights and interest," and expressly threatened to "commence formal legal action" against Fein and his attorney if they did not respond "with a satisfactory explanation within 14 days." Id.  After Fein's attorney responded, Fein did not hear from Ferring until it filed its lawsuit almost eight years later. According to the Defendants, nine years have therefore passed between the time Ferring received actual notice of Fein's patent applications and the commencement of this action.

On the other hand, according to Ferring, the plain language of the statute demonstrates that the patent must be issued first and the laches clock does not run prior to issuance.  Under 35 U.S.C. § 256, district courts may correct inventorship of issued patents in the following situations.

> Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, . . . [t]he court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

35 U.S.C. § 256.   Ferring contends that only once a patent is issued, can a § 256 claim accrue, and that "[d]istrict courts do not have the power to correct inventorship of pending patent

18

applications." (Pl. Opp. at 10-11). Thus, Ferring avers that the laches period here should be measured from the date that the patents-in-suit were issued, September 21, 2010 for the '761 patent, August 25, 2009 for the '321 patent, and July 29, 2008 for the '203 patent.

The Federal Circuit recently issued a decision addressing this issue in Hor v. Chu. With respect to inventorship claims, the Court reaffirmed its prior holding in Advanced Cardiovascular that laches for a § 256 claims does not begin prior to issuance. Specifically, the Federal Circuit held that "the laches period for a § 256 correction of inventorship claim begins to run when the omitted inventor knew or should have known of the issuance of the patent, regardless of whether the omitted inventor knew or should have known of the omitted inventorship while the patent application was pending before the PTO." Hor, 699 F.3d at 1336-37. In reaching its holding, the Court relied on the statutory language of § 256 to confirm that latches cannot begin, until the patent actually issues. Id. at 1336 (stating that "[n]othing in the plain language of § 256 or the accompanying regulations indicates that the failure to challenge inventorship before the PTO can potentially bar an inventor from later contesting inventorship under § 256.").

19

Allergan has also asserted one delay period for all three patents-in-suit, but "each patent is a separate chose in action." Stark v. Advanced Magnetics, Inc., 29 F.3d 1570, 1576 (Fed. Cir. 1994) (Stark I). The Federal Circuit stated that "the general rule is that the laches period does not accrue until each patent issues, even if the patents are interrelated." Id. at 1576.

Here, the '761 patent was issued on September 21, 2010, the '321 patent was issued on August 25, 2009, and the '203 patent was issued on July 29, 2008. Thus, the period between patent issuance and the April 5, 2012 filing date ranges from one year and six months to three years and eight months, which are less than the six-year delay required to invoke a presumption of laches. Accordingly, the laches period began to run once the patents-in-suit were issued and Ferring's § 256 claims are not barred by laches.

## B) Counts 4 And 5 (Ownership Claims) Are Time Barred And Dismissed

Where the complaint "clearly shows the claim is out of time," it should be dismissed with prejudice. See Troni v.

20

Holzer, No. 09 Civ. 10239 (WHP), 2010 WL 3154852, at *2-5
(S.D.N.Y. July 29, 2010) (dismissing claims on statute of
limitations grounds); see also Gonzales v. Nat'l Westminster
Bank PLC, 847 F. Supp. 2d 567, 570 (S.D.N.Y. 2012) ("Where the
facts needed can be gleaned from the complaint, papers integral
to the complaint, and publicly disclosed documents, resolution
of the limitations issue on a motion to dismiss is
appropriate.") (quoting In re Salomon Analyst Winstar Litig.,
373 F. Supp. 2d 241, 245 (S.D.N.Y. 2005)) (internal quotation
marks and brackets omitted); Cuoco v. Moritsugu, 222 F.3d 99,
112 (2d Cir. 2000) (dismissal without leave to amend is
warranted where amending the complaint would prove futile in
curing its deficiencies).


       Counts 4 and 5 assert that Ferring is entitled to
ownership of the patents-in-suit.  Specifically, in Count 4,
Ferring has contended that it is a rightful owner of Fein's
patents because Nardi co-invented the claimed subject matter and
was required by his Employment Agreement to assign ownership
rights to any invention he developed while employed at Ferring.
(See Compl. ¶¶ 167-172).


21

To begin with, Ferring has contended that "third-party transferees of misappropriated patents are proper defendants in inventorship and ownership actions." (See Pl. Opp. at 21) (citing Yeda Research & Dev. Co. Ltd. v. Imclone Sys. Inc., 443 F. Supp. 2d 570, 577-78 (S.D.N.Y. 2006); St. John's Univ. v. Bolton, 757 F. Supp.2d 144, 154 (E.D.N.Y. 2010)).  However, in Yeda, one defendant was the successor in interest to the organization that employed the named inventors, and the other was an exclusive licensee that agreed to take over the patent's prosecution.  See Yeda, 443 F. Supp. 2d at 577-78.  In Bolton, two defendants filed for the patents, and were the sole shareholders in the third defendant, which was assigned the patents.  See Bolton, 757 F. Supp. 2d at 154.  Neither case supports the claims against Allergan, which has no such relation to the patents-in-suit.

Although Count 4 is asserted against all Defendants, there are no allegations that Allergan was involved in the inventions or that Allergan is a party to, or beneficiary of, Nardi's Employment Agreement.  Allergan is not alleged to have any involvement with Fein's and Nardi's work until 2010.  (See Compl. ¶ 106).  In Count 5, Ferring has also alleged that the obligation to assign Fein's patents was implied, rather than

contractual.  (See Compl. ¶¶ 181-83).  As with Count 4, Ferring
has not alleged that Allergan was involved in the invention of
the claimed subject matter or that it was involved with Fein's
consulting relationship with Ferring.  Accordingly, Counts 4 and
5 are dismissed as against Allergan with prejudice.

Ferring has contended that "by virtue of Fein's and
Nardi's positions at Reprise and Serenity, Reprise and Serenity
are liable for the actions of their members or officers when
acting in these capacities."  However, Counts 4 and 5 assert
that Nardi and Fein are obliged to assign patents to Ferring by
virtue of associations with Ferring that ended in 2002, several
years before Reprise or Serenity were even formed.  Thus, Counts
4 and 5 are also dismissed with respect to Reprise or Serenity
because Ferring nowhere alleges that Reprise or Serenity had any
relationship or obligation to Ferring.

In addition, Ferring has recast Claims 4 and 5 as
actions for replevin, so that the statute of limitations does
not begin to run until "demand and refusal."  (See Pl. Opp. at
21) (citing Leadertex, Inc. v. Morganton Dyeing & Finishing
Corp., No. 93 Civ. 3755 (KTD), 1994 WL 445618, at *5 (S.D.N.Y.
Aug. 17, 1994) (action for replevin of fabrics)).  Count 4

23

sounds in breach of contract, not replevin, and must be brought within six years of the alleged breach—here, Nardi's alleged failure to assign rights in patent applications first pursued in 2003. (See Compl. ¶¶ 168-70); see also Bd. Of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc., 583 F.3d 832, 847-48 (discussing that a cause of action for patent ownership accrues upon knowledge of patent application).

Moreover, under Count 4, Ferring's claim for patent ownership based on Nardi's Employment Agreement is time-barred. In New York, actions sounding in breach of contract must be commenced within six years of the alleged breach. N.Y.C.P.L.R. 213(2) (McKinney 2012); Malone v. Bayerische Hypo-Und Vereins Bank, No. 08 Civ. 7277(PGG), 2010 WL 391826, at *5 (S.D.N.Y. Feb. 4, 2010), aff'd sub nom. Malone v. Bayerische Hypo-Und Vereinsbank, AG, 425 F. App'x 43 (2d Cir. 2011). Ferring has alleged that it owns Fein's patents because Nardi breached his contractual obligation to assign his ownership rights to any invention he discovered or participated in the discovery of during his employment. (See Compl. ¶¶ 169-71). Nardi's employment, however, ended in 2002 (see id. ¶ 67), and the alleged breach could have occurred no later than 2003, when Fein

24

first pursued his patent applications without naming Ferring as the assignee.

Ferring knew of Fein's patent applications in 2003; but even ignorance of the applications cannot save the claim, because "[t]he plaintiff need not be aware of the breach or wrong to start the [limitations] period running." See Marvel Worldwide, Inc. v. Kirby, 756 F. Supp. 2d 461, 470 (S.D.N.Y. 2010) (dismissing breach of contract counterclaims as time-barred even though plaintiff may not have been aware of breach when it occurred) (quoting Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007)).  Count 4 is therefore time barred, and is dismissed with prejudice.

Under Count 5, Ferring seeks equitable relief for breach of "fiduciary duties to Ferring" (see Compl. ¶¶ 182-83). Claims based on breach of fiduciary duties must be brought within six years of when "the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint." See IDT Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132, 140, 879 N.Y.S.2d 355 (N.Y. 2009) (citations omitted); see also N.Y.C.P.L.R. 213(1) (McKinney 2012).  Ferring was on notice of Fein's efforts to obtain his patents no later

25

than 2003.  Any damages from Fein's efforts to obtain patents
could have been alleged at that time, notwithstanding Ferring's
claim that it "has additionally been damaged in an amount . . .
no less than $43 million" (the amount of Allergan's up-front
payment for the patent assignments in 2010).  (See Compl. ¶¶
194, 206).  Because Ferring could have brought the claim nine
years before it did and more than six years have past when the
claim became enforceable, Count 5 is dismissed as untimely under
the six-year statute of limitations.


### C) Counts 6 And 7 (Breach Of Common Law Duty) Are Dismissed


        In Counts 6 and 7, Ferring has alleged that Fein and
Nardi owed "common law duties," such as "duties of
confidentiality, loyalty, good faith and fair dealing with
employer, and/or fiduciary duties."  (Compl. ¶¶ 186, 199).  Fein
and Nardi allegedly breached those duties by "using" Ferring
"confidential information" in designing and conducting clinical
studies and obtaining and commercializing patents on Fein's
inventions, and by providing Ferring documents to other
defendants for submission as evidence in The Hague Action.  (See
id. ¶¶ 187-89, 200-01).  Specifically, Fein and Nardi provided
"documents containing Ferring's confidential, trade secret,

proprietary, and privileged information to" the other defendants
"for use in . . . submissions to the District Court of The Hague
in proceedings adverse to Ferring." (See Compl. ¶¶ 187-88,
200). Ferring also alleges breach of contract claims with
respect to the same set of facts and that also is ground for
dismissal. See, e.g., Harris v. Provident Life & Accident Ins.
Co., 310 F.3d 73, 80-81 (2d Cir. 2002) ("New York law . . . does
not recognize a separate cause of action for breach of the
implied covenant of good faith and fair dealing when a breach of
contract claim, based upon the same facts, is also pled.").

The alleged damages stem from the alleged breaches of
common law duties because Fein "obtained at least three patents"
and the non-Allergan defendants "have received at least $43
million in payments from Allergan to date." (Id. ¶¶ 192, 204).
Yet neither of these alleged harms, even if they were cognizable
damages, could be "damages directly caused by [Allergan's]
misconduct," as required to state a claim against Allergan. See
Palmetto Partners, L.P. v. AJW Qualified Partners, LLC, 83
A.D.3d 804, 807, 921 N.Y.S.2d 260 (2d Dep't 2011) (finding that
a lower court should have dismissed a claim for breach of
fiduciary duty because plaintiffs "suffered no damages from any
breach of fiduciary duty.") (citations omitted).

27

The alleged damages here are unrelated to the document submissions in The Hague.  The last of Fein's three patents were issued in 2010, the same year that Reprise and Serenity assigned the patent rights to Allergan.  (See Compl. ¶¶ 97, 106).  The document submissions, however, did not occur until January 11, 2012.  (See id. ¶ 108).  The allegation of damages suffered were more than a year before the alleged breaches and thus unavailing.

The claims for breach of common law duties are also time-barred.  Since Ferring seeks equitable relief (see Compl. ¶¶ 196, 208), its breach of fiduciary duty claims are governed by a six-year statute of limitations that begins accruing "when all elements of the tort can be truthfully alleged in a complaint."  See IDT Corp., 12 N.Y.3d at 139; N.Y.C.P.L.R. 213(1) (McKinney 2012).  To the extent that either Fein or Nardi owed common law duties to Ferring, Ferring's claims would have begun to accrue with the alleged breach, the patent application in 2003.

In addition, Ferring has not alleged that Allergan, Serenity or Reprise had a relationship with Ferring that would

28

give rise to any common law duties.  Accordingly, for the
reasons stated above, Counts 6 and 7 are dismissed as to all
parties.

### D) Counts 8 And 9 (Aiding And Abetting) Are Dismissed

To state a claim for aiding and abetting breach of
fiduciary duty under New York law, Ferring must allege "(1) a
breach by a fiduciary of obligations to another, (2) that the
defendant knowingly induced or participated in the breach, and
(3) that plaintiff suffered damage as a result of the breach."
See Palmetto Partners, 83 A.D.3d at 808.

Ferring has alleged that Allergan aided and abetted
breaches of common law duties owed by Fein and Nardi by
"requesting and/or accepting from [them] Ferring documents for
use in activities adverse to Ferring's interest including in
submissions to the District Court of The Hague."  (Compl. ¶¶
212, 221).

Ferring has not alleged that Allergan "knowingly
induced or participated in" any breach.  See Palmetto Partners,
83 A.D.3d at 808.  Ferring has alleged only that Allergan,

29

through some sort of "due diligence," "either knew or should
have known" of Fein's and Nardi's employment histories and all
duties allegedly arising therefrom, and that the documents
submitted in The Hague Action were "confidential, trade secret,
proprietary, and privileged," and revealed Fein's and Nardi's
status as former agents of Ferring.  (See Compl. ¶¶ 212, 221).

The harms alleged from the aiding and abetting claims
include Fein's "obtaining at least three patents" and defendants
sharing "at least $43 million in payments from Allergan to
date."  (Compl. ¶¶ 213, 222).  Neither of these harms have been
adequately alleged to have anything to do with the document
submissions to the District Court of The Hague.

Allergan's single alleged act of aiding and abetting
relates to document submissions in The Hague.  (See Compl. ¶¶
212, 221).  The alleged damages of the $43 million Allergan paid
to Serenity and Reprise for assignment of the patents-in-suit
(Compl. ¶¶ 215, 224), however, preceded The Hague submissions.

In addition, the tort of aiding and abetting breaches
of common law duty does not encompass a "should have known"
standard and actual knowledge is required.  See Kaufman v.

Cohen, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157 (1st Dep't 2003)
(claim for aiding and abetting breach of fiduciary duty was
properly dismissed where there were "no facts in the complaint
from which it could be inferred that the . . . defendants had
actual knowledge" of any purported breach).

Ferring's recitals concerning Allergan's "knowing
participation" in breaches are inadequate.  Specifically,
Ferring has alleged that Allergan (i) "request[ed] and/or
accept[ed]" Ferring documents for use in The Hague action, and
(ii) "knew or should have known [Fein's or Nardi's] employment
history and consequently that [they owe] Ferring substantial
common law duties."  (Compl. ¶¶ 212, 221).  This allegation does
not identify the "substantial assistance" required for knowing
participation.  See Kaufman, 760 N.Y.S.2d at 170.  Ferring has
conceded that the allegations in Kaufman were "conclusory" (Pl.
Opp. at 22), but cannot distinguish its own allegations from the
inadequate language at issue in Kaufman, 760 N.Y.S.2d at 169
(defendants "were aware of Cohen's and plaintiff's prior
involvement with and beneficial ownership interest . . ., and
therefore knew of the fiduciary duty owed to plaintiffs by Cohen
or acted in reckless disregard of the same.").

31

Ferring's allegations do not meet the applicable pleading standard. Ferring has offered no reason for Allergan to have known of any specific duties, contractual or implied, owed by either Fein or Nardi to Ferring. There is no allegation that Allergan saw or even knew of Nardi's Employment or Severance Agreements, or that Allergan had any actual knowledge whatsoever of the nature of Nardi's or Fein's relationships with Ferring — relationships that concluded approximately eight years prior to the assignment of the patents to Allergan. Without an allegation of actual knowledge on the part of Allergan of the alleged common law duties, Counts 8 and 9 are dismissed as against Allergan.

The aiding and abetting claims are also untimely. The applicable limitations period for an aiding and abetting claim is the same as for the underlying violation, which in this case is an alleged breach of fiduciary duties. See Glonti v. Stevenson, No. 08-cv-8960 (CM), 2009 WL 311293, at **6, 13 (S.D.N.Y. Feb. 6, 2009) (dismissing as time-barred, pursuant to Rule 12(b)(6), claims including breach of fiduciary duties and aiding and abetting breach of fiduciary duties). Because Ferring's claims for breach of fiduciary duties carry six-year limitations periods and are themselves time-barred, Ferring's

32

aiding and abetting claims are similarly infirm on timeliness grounds and therefore dismissed.

### E) **Counts 10 And 11 (Breach Of Contract) Are Dismissed**

Breach of contract under New York law requires: (1) the existence of an agreement; (2) adequate performance of the contact by plaintiff; (3) breach of contract by defendant; and (4) damages.  Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).  Ferring's claims for breach of contract involve allegations arising from Nardi's Employment Agreement of his Severance Agreement.  (See Compl. ¶¶ 228, 245).  Ferring has alleged that Nardi breached his Employment and Severance Agreements by (a) using Ferring confidential information to design and conduct clinical studies and obtain and commercialize patents covering desmopressin formulations, and (b) providing Ferring confidential information to the other defendants as part of the discovery process in The Hague Action. (See id. ¶¶ 234-35, 250-51.)

There are no allegations of a contractual relationship with any of the other Defendants.  Ferring has not pled facts demonstrating that Fein, Allergan, Reprise or Serenity had a

33

contractual relationship with Ferring or that any breaches of contract were committed.  Accordingly, Ferring's claims for breach of contract are dismissed as against these parties for improper pleading.  See Swan Media Group, Inc. v. Staub, No. 11-civ-2250 (RWS), 2012 WL 160073, at *3-4 (S.D.N.Y. Jan. 18, 2012) (dismissing breach of contract claim for failure to properly plead the existence of an enforceable contract).

The breach of contract claims are also time-barred. To the extent Nardi breached any contract by using Ferring information to develop desmopressin products or assist in obtaining patents, those breaches accrued no later than 2003, when Fein first pursued his patent applications independently. The six-year statute of limitations for breach of contract has run.  See Marvel, 756 F. Supp. 2d at 470 ("The plaintiff need not be aware of the breach or wrong to start the [limitations] period running.") (citation omitted).  Ferring's breach of contract claims against Nardi are thus time-barred and dismissed.

## F) Count 12 (Interference With Contractual Relations) Is Dismissed

34

A tortious interference with contractual relations claim under New York law requires a plaintiff to prove: (1) the existence of a valid contract between itself and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract; and (4) damages. See Mina Inv. Holdings Ltd. v. Lefkowitz, 16 F. Supp. 2d 355, 359 (S.D.N.Y. 1998) (citations omitted). Further, to sustain a claim for tortious interference with a prospective contract with a third party, a plaintiff must demonstrate that (1) but for the actions of the defendant, the contract would have been formed and (2) in preventing the contract from being executed, the defendant intended to "damage the plaintiff" or engaged in "dishonest, unfair or otherwise improper" conduct. Bankers Trust Co. v. Bernstein, 169 A.D.2d 400, 401, 563 N.Y.S.2d 821 (N.Y.App. Div. 1st Dep't 1991).

Ferring's allegation with respect to Allergan's alleged involvement in purported breaches is that "U.S. and European counsel for Fein, Allergan, Serenity, and Reprise approached Nardi for assistance" in The Hague Action, and then submitted evidence allegedly containing Ferring confidential information to the District Court of The Hague. (See Compl. ¶ 267).

Fatally, Ferring fails to plead a requisite element of a claim for intentional interference with contractual relations, namely, that Allergan intended to induce any contractual breaches. See Jones v. City Sch. Dist. Of New Rochelle, 695 F. Supp. 2d 136, 148 (S.D.N.Y. 2010) (stating that intentional inducement is a necessary element of the claim). There is no allegation that Allergan intended to cause contractual breaches.

Count 12 also should be dismissed as against all other defendants because Ferring fails to plead any pecuniary damages resulting from alleged inducements of breach, as required by New York law. See Int'l Minerals & Resources, S.A. v. Pappas, 96 F.3d 586, 595-97 (2d Cir. 1996). Ferring alleges only that defendants' evidentiary submissions in The Hague were "adverse to Ferring's interest," but does not plead any actual damages resulting therefrom. (See Compl. ¶ 267.) Indeed, the only reference to damages is the $43 million paid by Allergan for the assignment of the patents-in-suit, which assignment occurred in 2010 (see id. ¶ 106), almost two years before the breach Allergan allegedly induced.

36

Ferring also has alleged that helping Fein develop desmopressin formulations and obtain patents were inducements of breach (see id. ¶¶ 266, 270).  In New York, the statute of limitations for intentional interference with contractual relations is three years.  See N.Y.C.P.L.R. 214(4) (McKinney 2012).  A claim accrues "at the time the injury is sustained." Rosemeier v. Schenker Int'l, Inc., 895 F. Supp. 65, 66 (S.D.N.Y. 1995).  Because the injury allegedly suffered by Ferring as a result of assistance in developing and obtaining desmopressin patents occurred in 2003, when the alleged contractual interference caused Fein to file his patent applications, Ferring's claims are untimely and therefore dismissed.

## G) Count 13 (Misappropriation of Trade Secrets) Is Dismissed

To state a misappropriation claim, Ferring must allege that "(1) it possessed a trade secret, and (2) defendants are using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." Geritrex Corp. v. Dermarite Indus., LLC, 910 F. Supp. 955, 961 (S.D.N.Y. 1996).  Ferring has not alleged that Allergan is using that information in breach of any agreement, confidence, or duty.

37

Ferring's misappropriation claim is based on evidentiary submissions to a foreign tribunal.  (See Compl. ¶¶ 277-78).  Because Ferring has conceded that Allergan did not submit the documents in breach of its own "agreement, confidential relationship, or duty" (Pl. Opp. at 23), the "analysis . . . turns on whether [Ferring] sufficiently pleaded that [Allergan] used [Ferring's] trade secrets as a 'result of discovery by improper means.'"  See Watts v. Jackson Hewitt Tax Servs., Inc., 675 F. Supp. 2d 274, 280 (E.D.N.Y. 2009).

In Watts, as here, a party obtained allegedly confidential materials from the claimant's former employees and then submitted them during discovery in an action involving the claimant.  Id. at 277-78.  The Court found that "[d]iscovery by improper means" does not include purported "abuses of the civil discovery process."  Id.  Ferring fails to distinguish Watts from the instant case.

In addition, even if there were such a relationship between Allergan and Ferring, Allergan's use of that information, accepting and submitting documents in The Hague Action, does not constitute misappropriation.  (See Compl. ¶¶

38

277-78.) The mere submission of documents as part of the discovery process does not constitute misappropriation. See Watts, 675 F. Supp. 2d at 280 ("'Discovery by improper means'' refers not to abuses of the civil discovery process, but rather to industrial espionage.") (citation omitted). Even if Allergan somehow improperly induced Fein or Nardi to provide it with Ferring trade secrets, "mere conclusory statements that they did so pursuant to . . . underhanded prodding fails to raise this allegation 'above the speculative level.'" See id. (citing Twombly, 550 U.S. at 555).

Count 13 should also be dismissed because the limitations period for a misappropriation claim has already run. In New York, misappropriation claims must be brought within three years of "when the defendant discloses the trade secret or when he first makes use of plaintiff's ideas." Synergitcs USA, Inc. v. Alcon Laboratories, Inc., No. 08 Civ. 3669 (DLC), 2009 WL 2016872, at *2 (S.D.N.Y. July 9, 2009) (quotation omitted); see also N.Y.C.P.L.R. 214(4) (McKinney 2012). Ferring has alleged that Fein and Nardi first misappropriated Ferring's "labor, skill, and expenditures, as well as its confidential, trade secret, proprietary, and privileged information" by collaborating with Serenity and Reprise to obtain and

39

commercialize patents covering desmopressin formulations and designing and conducting clinical studies. (See Compl. ¶¶ 280, 295.) The three-year limitations period began in 2003, when Fein first applied for patents covering desmopressin formulations. Accordingly, for the reasons stated above, Count 14 is dismissed.

### H) Count 15 (Conversion) Is Dismissed

The tort of conversion requires that the defendant, "intentionally and without authority, assumes or exercises control over personal property belonging to someone else." Marketxt Holdings Corp. v. Engel & Reiman, P.C., 693 F. Supp. 2d 387, 395 (S.D.N.Y. 2010). Ferring has not alleged any facts demonstrating that Allergan intentionally exercised control over Ferring property.

Count 15 is also time-barred. Conversion claims are subject to a three-year statute of limitations, which begins running when the alleged conversion takes place. See N.Y.C.P.L.R. 214(3) (McKinney 2012); see also Sporn v. MCA Records, 58 N.Y.2d 482, 488-89 (1983) (barring conversion claim because statute of limitations had run). Ferring has contended

40

that the conversion claims did not accrue until "Ferring's demands and Defendants' refusals in early 2012." However, in the case Ferring has cited, accrual based on demand and refusal applies where "the party in possession has not acquired possession wrongfully, and has not otherwise exercised wrongful dominion over the property." <u>Bolton</u>, 757 F. Supp.2d at 179. The later accrual period therefore applies only if defendants' alleged acquisition of the Ferring documents and patents-in-suit were lawful. However, Ferring has pled that the acquisition was unlawful (<u>see, e.g.</u>, Compl. ¶¶ 190, 202, 237). To the extent that Fein and Nardi are alleged to have exercised control over any information belonging to Ferring, the conversion took place in 2002, by retaining documents after completing their employment and/or consultancies. If, as Ferring has alleged (<u>see id.</u> ¶ 310), any defendant used unlawfully obtained Ferring material to develop desmopressin formulations or obtain patents, the defendant must have had that material prior to 2003, when Fein first filed his patent applications. Count 15 is therefore time-barred.


## I) <u>Count 16 (Fraudulent Concealment) Is Dismissed</u>

"Fraudulent concealment is a species of common law fraud." Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 150 (2d Cir. 1995). "Under New York law, fraudulent concealment requires proof of:  (1) failure to discharge a duty to disclose; (2) intention to defraud, or scienter; (3) reliance; and (4) damages." TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 90-91 (2d Cir. 2005).  The duty to disclose requires a fiduciary relationship between plaintiff and defendant.  See Spencer v. Green, 42 A.D.3d 521, 522, 842 N.Y.S.2d 445 (2d Dep't 2007).

Misrepresentations or omissions must be pleaded with specificity or the claims will be dismissed.  See, e.g., Ben Hur Moving & Storage, Inc. v. Better Bus. Bureau, No. 08 Civ. 6572, 2008 WL 4702458, at *4 (S.D.N.Y. Oct. 3, 2008) ("The plaintiff's complaint fails [the Rule 9(b)] standard because the allegations in the complaint do not specify the time, place, [or] speaker . . . of the misrepresentations that were allegedly made . . . ."); Armored Group, LLC v. Homeland Security Strategies, No. 07-CV-9694(LAP), 2009 WL 1110783, at *1 (S.D.N.Y. 2009) (dismissing a fraudulent inducement claim where plaintiff "does not identify the location where the misrepresentations were made . . . does not provide exact dates for the statements . . . and fails to

42

sufficiently identify 'who' the speaker is concerning each statement").

In addition, "[i]t is well-settled that a complaint alleging fraud under New York law must comply with the heightened pleading standard under Rule 9(b) which requires that 'the circumstances constituting fraud . . . must be stated with particularity.'" Woods v. Maytag Co., No. 10 Civ. 0559(ADS)(WDW), 2010 WL 4314313 at *5 (E.D.N.Y. Nov. 2, 2010) (quoting Fed. R. Civ. P. 9(b)); see also Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000).

Ferring has contended that it is not required to plead fraudulent intent with particularity, relying on Rule 9(b)'s provision that "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally." But "the relaxation of Rule 9(b)'s specificity requirement for scienter 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations'". Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d cir. 1994), quoting O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991). Instead, "to serve the purposes of Rule

43

9(b), [the Second Circuit] require[s] plaintiffs to allege facts that give rise to a strong inference of fraudulent intent." Id.

"[W]hen pleading scienter, plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." Woods, 2010 WL 4314313, at *6.  Furthermore, "basing allegations of knowledge and fraudulent intent 'upon information and belief' without anything more will not satisfy the pleading requirements under Rule 9(b)." Id. at *7 (citing Premium Mortgage Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009) ("Allegations that are conclusory or unsupported by factual assertions are insufficient.")); Luce v. Edelstein, 802 F.2d 49, 54 n. 1 (2d Cir. 1986) ("Allegations of fraud cannot ordinarily be based 'upon information and belief,' except as to 'matters peculiarly within the opposing party's knowledge.'").

Ferring has failed to plead with the requisite specificity the misrepresentations or omissions that form the basis of Ferring's fraudulent concealment claim.  "The particularity requirement of Rule 9(b) demands that a plaintiff '(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4)

44

explain why the statements (or omissions) are fraudulent.'"

Woods, 2010 WL 4314313 at *5 (quoting Harsco Corp. v. Segui, 91

F.3d 337, 347 (2d Cir. 1996)).  Ferring has alleged Fein's and

Nardi's intent "on information and belief" (See Compl. ¶ 325)

("On information and belief, the actions of Fein and Nardi have

been at all times knowing, willful, and malicious.")) and

without more, thereby fails to allege fraudulent intent with

particularity.  There are also no facts alleged that Allergan

intentionally or even knowingly defrauded Ferring.  See Saltz v.

First Frontier, LP, 782 F. Supp.2d 61, 75 (S.D.N.Y. 2010)

(dismissing fraudulent concealment claim for failure to plead

scienter).


        Here, Ferring has alleged that Fein and Nardi made

misrepresentations to Ferring or failed to disclose facts they

had a duty to disclose (see Compl. ¶¶ 318-323), but has not

identified when, where, or how these alleged misrepresentations

or omissions occurred.  (See Compl. ¶ 318) (alleging that "Fein

has repeatedly assured Ferring that he would use no Ferring

confidential, trade secret, proprietary or privileged

information" without specifying when such assurances were given

or to whom).


                                45

In addition, Ferring has not alleged that it relied on
any specific misrepresentation or omission by either Nardi or
Fein or that such alleged reliance is reasonable or justifiable.
See, e.g., Kramer v. Schloss, 2004 U.S. Dist. LEXIS 30964, at
*24 (N.D.N.Y Nov. 30, 2004).  ("In order to prove the reliance
element of a fraudulent concealment claim, a plaintiff is
required to demonstrate that the alleged misrepresentation or
omission induced him to act or to refrain from acting to his
detriment . . .  The reliance must also be reasonable or
justifiable."); Waksman v. Cohen, 00 Civ. 9005 (WK), 2002 U.S.
Dist. LEXIS 21209, at *18 (S.D.N.Y. Nov. 4, 2002) ("As a result,
in order to maintain a claim for fraudulent concealment, the
Plaintiff must establish that he 'actually relied on the
disclosure or lack thereof.'" (quoting Banque Arabe Et
Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d
146, 156 (2d Cir. 1995)).  Ferring's allegations as to Fein and
Nardi is that their acts "prevented Ferring from discovering
their claims set forth in this complaint." (Compl. ¶ 321).


As to the other defendants, Ferring has not alleged a
fiduciary relationship between Serenity and Reprise or any duty
of Serenity and Reprise to Ferring.  Count 16 does not allege

46

that Serenity and Reprise acted with intent to defraud.  Taken together, Count 16 is therefore dismissed as to those parties.

## J) Count 17 (Unjust Enrichment) Is Dismissed

To state a claim for unjust enrichment in New York, a plaintiff must allege that: (1) the defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant to make restitution.  Intellectual Capital Partner v. Institutional Credit Partners LLC, No. 08 Civ. 10580, 2009 WL 1974392, at *8 (S.D.N.Y. Jul. 8, 2009).  Although a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment," there can be no claim where the connection between the plaintiff and defendant is attenuated.  Sperry v. Crompton Corp., 8 N.Y.3d 204, 215-16, 831 N.Y.S.2d 760 (2007) (dismissing unjust enrichment claim because parties lacked direct relationship); see also Georgia Malone & Co., Inc. v. Ralph Rieder, 86 A.D.3d 406, 408, 926 N.Y.S.2d 494 (1st Dep't 2011) (unjust enrichment claim requires "a connection or relationship between the parties that could have caused reliance or inducement on the plaintiff's part").

47

Ferring has alleged that the Defendants have been unjustly enriched by using Ferring confidential information in "patenting, developing, and/or commercializing certain desmopressin formulations." (Compl. ¶ 330). However, Ferring has not alleged a relationship between Allergan and Ferring to support a claim for unjust enrichment. Ferring has furthermore failed to plead the requisite relationship or connection between Ferring and Serenity or Reprise.

Ferring's unjust enrichment claim is also time-barred. The limitations period for unjust enrichment claims is six years, and it starts running when the defendant commits the wrongful act that enriches him. See Cohen v. Cohen, 773 F. Supp.2d 373, 397 (S.D.N.Y. 2011) (dismissing unjust enrichment claim as time-barred). To the extent any defendants committed a wrongful act that led to "patenting, developing, and/or commercializing certain desmopressin formulations," that act would necessarily have occurred no later than 2003 when Fein first applied for patents covering those formulations. Accordingly, the claim for unjust enrichment comes well after the six-year limitations period has run and is therefore dismissed against all Defendants.

48

## III. **Conclusion**

Based upon the facts and conclusions set forth above, the Defendant's motion to dismiss is granted as to all counts, except for Counts 1 through 3.

It is so ordered.

**New York, NY**
**March / 8 , 2013**

ROBERT W. SWEET
U.S.D.J.

49