**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FERRING B.V.,
FERRING INTERNATIONAL CENTER S.A., and
FERRING PHARMACEUTICALS INC.,

       Plaintiffs,

       v.

ALLERGAN, INC.,
ALLERGAN USA, INC.,
ALLERGAN SALES, LLC,
SERENITY PHARMACEUTICALS CORPORATION,
SERENITY PHARMACEUTICALS, LLC,
REPRISE BIOPHARMACEUTICS, LLC,
SEYMOUR H. FEIN, and
RONALD V. NARDI,

       Defendants.

Civil Action No. 12-CV-2650 (PKC)

ECF Case

## FERRING'S MOTION FOR SANCTIONS

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

I.      INTRODUCTION ...................................................................................................... 1

II.     FACTUAL BACKGROUND ..................................................................................... 2

III.    LEGAL STANDARD ................................................................................................. 7

IV.     ARGUMENT .............................................................................................................. 8

        A.      The Actions of Jones Day, and Chris Harnett in Particular, Warrant
                Sanctions ........................................................................................................ 8

        B.      Amount of Sanctions .................................................................................... 18

V.      CONCLUSION ......................................................................................................... 18

## TABLE OF AUTHORITIES

**Federal Cases**

*Abraham v. Volkswagen of Am., Inc.*,
   No. CIV-90-725T, 1991 WL 89917 (W.D.N.Y. Mar. 11, 1991)................................. 8, 12, 15

*Enmon v. Prospect Capital Corp.*,
   675 F.3d 138 (2d Cir. 2012)................................................................................................. 7, 8

*Gust, Inc. v. Alphacap Ventures, LLC*,
   905 F.3d 1321 (Fed. Cir. 2018)........................................................................................... 7, 8

*Oliveri v. Thompson*,
   803 F.2d 1265 (2d Cir. 1986).................................................................................................. 7

*Schlaifer Nance & Co. v. Estate of Warhol*,
   194 F.3d 323 (2d Cir. 1999)................................................................................................... 8

**Federal Statutes**

28 U.S.C. § 1927...................................................................................................... 2, 7, 8, 9, 13

**Federal Rules**

Federal Rule of Evidence 408............................................................................................... 13

**State Rules**

New York Rule of Professional Conduct 1.2(a) ................................................................ 13, 18

## I.    INTRODUCTION

Plaintiffs/Counterclaim-Defendants Ferring B.V., Ferring International Center S.A., Ferring Pharmaceuticals Inc. (collectively, "Ferring") has become aware of allegations suggesting that counsel for Defendants/Counterclaimants Serenity Pharmaceuticals, LLC ("Serenity"), and Reprise Biopharmaceutics, LLC ("Reprise") (collectively with Serenity, "Counterclaimants") unreasonably and vexatiously multiplied the proceedings in this case. Specifically, Serenity filed counterclaims against Jones Day, counsel for Counterclaimants, after Jones Day sued Serenity and its principals in New York state court. Therein, Serenity alleges that it asked Jones Day to withdraw the counterclaims in this case before the bench trial that commenced on July 23, 2019 (the "July 2019 trial"). Rather than honoring that request, however, Chris Harnett, the lead Jones Day attorney during trial, threatened Serenity with unfounded and baseless accusations that Ferring would pursue legal action against Serenity's executives if the counterclaims were withdrawn.

Jones Day never informed Ferring or this Court that their client Serenity wanted to withdraw their counterclaims seeking joint inventorship on Ferring's patents. If Jones Day had done so, trial in this case could have been avoided in its entirety. At the time of trial, only the counterclaims were at issue, and as Ferring explained in filings at the time, the counterclaims were virtually worthless to Counterclaimants even if successful. *See* D.I. 419 at 4-5. Moreover, the relative lack of value of the counterclaims seems to explain any perceived inconsistency between Jones Day seeking to withdraw as counsel before trial, while simultaneously refusing to allow Serenity to settle. As explained in greater detail below, it is extremely difficult to justify the millions of dollars Jones Day billed to its client with the fact that the claims Jones Day was pursuing did not have any financial benefit. Thus, listening to its client and allowing Serenity to

withdraw the counterclaims would have forced Jones Day to reconcile these issues at a time when it was already having difficulty getting its client to pay.

Ferring also made clear in its opposition to Jones Day's motion to withdraw as counsel that it would not oppose Jones Day's withdrawal if the counterclaims were dismissed with prejudice, which is inconsistent with Chris Harnett's suggestion that Ferring would have aggressively pursued action against Serenity and its principals for seeking to do just that. *See id.* at 8. According to Serenity's state court claims, this was not conveyed to Serenity, just as their own desire to withdraw or dismiss the counterclaims was not conveyed to Ferring or the Court.

Because of the actions of Jones Day, including specifically those of Chris Harnett, the parties were forced to try claims that Jones Day's own client did not want to pursue. Therefore, Ferring respectfully requests that this Court use its inherent power and/or the authority provided by 28 U.S.C. § 1927 to sanction Jones Day and Chris Harnett for the excess costs, expenses, and attorneys' fees that Ferring unnecessarily incurred in relation to the July 2019 trial.

## II.     FACTUAL BACKGROUND

On December 11, 2019, Jones Day sued Serenity, Samuel Herschkowitz (the Chief Executive Officer and Chairman of Serenity), and Alain Kodsi (the President and Director of Serenity) (collectively, the "State Court Defendants") in the Supreme Court of the State of New York, County of New York. (Ex. A, Complaint.) In that case, Jones Day seeks $5,298,178.60 from the State Court Defendants, based in part on work purportedly done by Jones Day on behalf of Serenity in connection with this case. (Ex. B, Amended Complaint at ¶¶ 2-8, 67, 73, 81, 88.)

On September 21, 2020, Serenity answered Jones Day's complaint and filed counterclaims based on breach of contract, fraud, legal malpractice, and violation of New York Judiciary Law § 487. (Ex. C, Counterclaims at ¶¶ 149-183.) Ferring first learned of the facts

supporting the instant motion for sanctions only upon review of Serenity's state court counterclaims. (Decl.[1] at ¶ 2.) Therein, Serenity alleges that:

> 25. Concerned about the mounting expense of pursuing its counterclaims in the 2012 Action, Serenity asked Jones Day to withdraw them. In response, Chris Harnett, then a partner at Jones Day, twice told Serenity that the company had no choice but to pursue those counterclaims because if it did not, Ferring would sue its executives and members personally and "come after their houses."

(Ex. C, Counterclaims at ¶ 25.)

> 83. Concerned about the mounting expense of continuing to pursue its counterclaims in the 2012 Action, Serenity told Jones Day that it wanted to withdraw or dismiss the counterclaims before trial.

> 84. In response, Jones Day told Serenity that Serenity had no choice but to pursue those counterclaims because if it did not, Ferring would sue its executives and members personally and "come after executives' houses."

> 85. Jones Day's claim that withdrawing the 2012 Action counterclaims would lead to Ferring personally suing Serenity's managers and owners was a baseless and unethical shakedown.

> 86. By contrast, Jones Day has personally sued Serenity's members and managers Dr. Samuel Herschkowitz and Alain Kodsi for allegedly failing to pay Jones Day.

> 87. Upon information and belief, Jones Day never spoke to Ferring's lawyers about the possibility of settlement of the counterclaims in the 2012 Action before telling Serenity that it had no choice but to pursue those counterclaims because if it did not, Ferring would sue its executives and members personally and "come after executives' houses."

> 88. On the contrary, in June 2019, Ferring told the Court that it would consent to Jones Day's withdrawal as counsel if Serenity dismissed its counterclaims in the 2012 Action before trial. D.E. #419 at 8.

---

[1] As used herein, "Decl." refers to the Declaration of M. Bourke, submitted in support of this motion. Additionally, "Ex. __" refers to the exhibits that are attached thereto.

89. Jones Day did not inform Serenity that Ferring stated that it would consent to Jones Day's withdrawal as counsel if Serenity dismissed its counterclaims.

(*Id.* at ¶¶ 83-89.)

Prior to the filing of Serenity's state court counterclaims, Ferring had no way of knowing about conversations between Jones Day and Serenity, including conversations in which Jones Day falsely informed Serenity that Ferring would "come after executives' houses" if Serenity withdrew or dismissed their counterclaims from this case. Ferring can confirm, however, that Jones Day never approached Ferring about Serenity's desire to withdraw or dismiss their counterclaims in this action, and Ferring certainly never threatened to come after executives' houses if Serenity withdrew its counterclaims. (Decl. at ¶ 3.) To the contrary, Ferring indicated that it would not have opposed Jones Day's attempt to withdraw from this case shortly before trial if Counterclaimants dismissed their claims with prejudice. D.I. 419 at 8.

On June 25, 2019, less than a month before trial was scheduled to begin in this case, Jones Day sought to withdraw as counsel for Counterclaimants. D.I. 403. As Ferring explained in its opposition, "[t]o the extent that the Court conditioned a grant of Jones Day's motion to withdraw on ordering Counterclaimants to either proceed with the July 23 trial date or to dismiss their claims against Ferring with prejudice, Ferring would not oppose the withdrawal of Jones Day as counsel of record in this case." D.I. 419 at 8. At the hearing concerning Jones Day's motion to withdraw, Ferring again reiterated that dismissing the counterclaims—the only claims left in the case at that point—would resolve the remaining issues between the parties: "It's their claims, Serenity's claims . . . , and if they want to drop their claims, that's fine, but we're ready to defend ourselves, we're ready to go to trial, and the proceeding should not be disrupted at this point." (Ex. D., July 12, 2019 Hearing Tr. at 18:1-24.) According to Serenity, it had already informed Jones Day that it wanted to withdraw the counterclaims at this time, but Jones Day did

4

not share that information with Ferring or the Court. (Ex. C, Counterclaims at ¶¶ 83, 87-89.) The motivation for Jones Day's failure to act on its client's wishes may be found in counsel's statements at that time—under questioning from the Court as to why Jones Day did not raise the issues it was having with its clients and the possibility of withdrawal earlier, Chris Harnett explained, "I wanted to be paid, and I wanted to finish the lawsuit and win it." (Ex. D at 11:19-14:23.)

Additionally, in connection with Ferring's opposition to Jones Day's withdrawal as counsel, Ferring noted that the counterclaims set for trial did not have any value for Counterclaimants and that the only plausible motive to maintain the counterclaims at that time was the ongoing harassment of Ferring. D.I. 419 at 4-5. According to Serenity, those limitations of the counterclaims against Ferring—which are echoed in Serenity's own claims against Jones Day—were never conveyed:

> 43. After the January 7, 2016 opinion concerning Ferring's motion for summary judgment dismissed the counterclaims that Dr. Fein is the sole inventor of the Ferring Patents, Jones Day knew or should have known that the remaining counterclaims in the 2012 Action that Dr. Fein is the co-inventor of the Ferring Patents had *de minimis* value to Serenity.
>
> 44. Jones Day did not send Serenity an appraisal of the value of the counterclaims after the 2016 decision.
>
> 45. Upon information and belief, Jones Day did not perform an appraisal of the value of the counterclaims after the 2016 decision, despite its claimed expertise in patent valuation.
>
> 46. Jones Day knew or should have known that even if Dr. Fein were ultimately listed as a co-inventor of the Ferring Patents, the value of Serenity's recovery on the counterclaims was not worth the cost of continuing to pursue them, nor would any positive verdict on behalf of Serenity have yielded any revenue. Jones Day did not inform Serenity of this fact.
>
> 47. The Ferring Patents cover Ferring's competitor to Serenity's drug Noctiva, but multiple other patents cover that product in

addition to the Ferring Patents. Therefore, there was no competitive advantage or monetary return that could have resulted from the countersuit. Jones Day did not inform Serenity of this fact.

48. Even if Dr. Fein had been added as co-inventor of the two Ferring Patents, and even if Serenity had obtained his rights in those patents, Serenity still would not have been able to extract any royalty payments from the Ferring Patents (because Dr. Fein would have had co- rather than full-ownership over those patents) and it also would not have been able to market its own version of Ferring's competitor to Serenity's Noctiva (because that drug was covered by multiple other patents).

49. Jones Day acknowledged that Serenity's counterclaims in the 2012 Action had minimal value when it did not assert a retaining or charging lien as it sought to withdraw as counsel for Serenity in June 2019. D.E. #410 n.3.

Ex. C, Counterclaims at ¶¶ 43-49.)

Notably, even after the Court specifically directed representatives of the parties to discuss potential settlement, *see* D.I. 445 at 493:2-3, Jones Day never indicated that their client had expressed a desire to dismiss or withdraw the counterclaims. Had counsel informed Ferring of Serenity's desire to dismiss or withdraw their claims, then the entirety of the costs, expenses, and attorneys' fees associated with the July 2019 trial could and would have been avoided.

On October 13, 2020, Jones Day moved to dismiss Serenity's state court counterclaims. The opening brief in support of Jones Day's motion to dismiss and many of the exhibits submitted therewith were filed under seal. Serenity's opposition to the motion to dismiss and Jones Day's reply, however, were not filed under seal and are publicly available. As described in greater detail in Section IV.A.1., those papers indicate that Jones Day does not appear to dispute the substance of the key facts underlying Serenity's allegations as those facts specifically relate to this motion for sanctions. The opposition and reply briefs were filed on November 12, 2020,

and November 18, 2020, respectively. (*See* Ex. E, Opposition to Mot. To Dismiss; Ex. F, Reply in Support of Mot. To Dismiss.)

### III.   LEGAL STANDARD

District courts can award sanctions due to vexatious litigation conduct pursuant to their inherent power and/or 28 U.S.C. § 1927: "In practice, 'the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is . . . that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both.'" *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 144 (2d Cir. 2012) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)) (ellipses in original). To that end, § 1927 sanctions may be assessed against anyone admitted to practice in a United States federal court who unreasonably and vexatiously multiples the proceedings:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

Because the availability of costs, expenses, and attorneys' fees pursuant to § 1927 is not a subject unique to the practice of patent law, it is governed by the law of the regional circuit. *Gust, Inc. v. Alphacap Ventures, LLC*, 905 F.3d 1321, 1327 (Fed. Cir. 2018). In the Second Circuit, sanctions under § 1927 are subject to the same requirements as sanctions imposed under the district court's inherent power, and therefore, require that both:

> (1) the challenged claim was without a colorable basis and

> (2) the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment or delay.

*Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999); *see also Gust*, 905 F.3d at 1327. Although this is a high standard, courts in the Second Circuit have previously sanctioned counsel for conduct similar to that alleged in Serenity's counterclaims against Jones Day, such as a failure to transmit settlement offers to a client and/or deliberate misrepresentations regarding the legal and procedural status of a case. *See, e.g., Abraham v. Volkswagen of Am., Inc*., No. CIV-90-725T, 1991 WL 89917, at *6 (W.D.N.Y. Mar. 11, 1991).

Additionally, the Second Circuit has made it clear that law firms can be held liable for actions of individual attorneys. *Enmon*, 675 F.3d 138 at 147 (it "would upset a relatively long-standing practice among district courts in our Circuit if we were to hold that law firms may not be sanctioned under § 1927 for the acts of certain attorneys").

## IV.   ARGUMENT

### A.   The Actions of Jones Day, and Chris Harnett in Particular, Warrant Sanctions

#### 1.   *There was no colorable basis to refuse Serenity's request to dismiss or withdraw their counterclaims.*

The basis for this motion is quite simple. If Jones Day had listened to its client—or at a bare minimum if Chris Harnett had not baselessly claimed that Serenity could not dismiss their counterclaims without fear of retribution from Ferring (without even speaking to Ferring)—then neither Ferring nor the Court would have been forced to devote time and resources to the July 2019 trial. Thus, the actions of Chris Harnett in particular and Jones Day more generally "unreasonably and vexatiously" multiplied the proceedings in this action, and both Chris Harnett and Jones Day should be held personally responsible for the excess costs, expenses, and attorneys' fees resulting from the July 2019 trial. *See* 28 U.S.C. § 1927

As described above, Serenity's state court claims against Jones Day set out a straightforward series of events that demonstrate that if Jones Day had respected its client's

desire to dismiss the counterclaims in this case, there would have been no need for trial. But instead, Jones Day and Chris Harnett engaged in a "baseless and unethical shakedown" of their own client, which also resulted in the expenditure of considerable resources by the Court and by Ferring. (*See* Ex. C, Counterclaims at ¶ 85.)

### a. The allegations in Serenity's state court counterclaims are credible

As an initial matter, Ferring recognizes that the state court action between Jones Day and Serenity is ongoing. However, in light of recent filings in that action, including Jones Day's November 18, 2020 reply in support of its motion to dismiss Serenity's state court counterclaims, it does not appear that the substance of the underlying facts that impact this motion are in dispute.[2] In response to Ferring's pre-motion letter seeking permission to file this motion for sanctions, Jones Day suggests that it does dispute these facts, but Jones Day's letter focuses on its reasons for arguing against Serenity's state court counterclaims rather than the import of the facts underlying Serenity's allegations—and Jones Day's acquiescence and/or admissions regarding those facts in its state court briefing—to the instant motion. Based on the publicly available information available to Ferring at this time, Ferring believes this matter to be ripe for adjudication.

Before Serenity filed its answer and counterclaims in the state court action, Ferring knew nothing of Serenity's attempts to get Jones Day to dismiss or withdraw their counterclaims in this case before trial. After reviewing those allegations, Ferring can confirm several aspects thereof. For example, Ferring never indicated that it would oppose any effort by Serenity to dismiss or withdraw their counterclaims or that Ferring would take action against Serenity's

---

[2] To the extent that Chris Harnett and/or Jones Day deny these allegations, including by reference to sealed materials submitted in the state court action, Ferring respectfully requests that the Court provide an opportunity for limited discovery into these matters.

executives in such an instance. (Decl. at ¶ 3.) In fact, Ferring repeatedly referenced the pointlessness of the counterclaims since Counterclaimants would gain little, if any, economic benefit even if they were successful on the merits. *See, e.g.*, D.I. 419 at 4-5. And Ferring explicitly informed Jones Day and Chris Harnett that it would not oppose Jones Day's withdrawal from the case if the counterclaims were dismissed. *Id.* at 8; (Ex. D, July 12, 2019 Hearing Tr. at 18:1-24). Ferring can also confirm that Jones Day never informed Ferring that Serenity wanted to withdraw their counterclaims. (Decl. at ¶ 3.) Their failure to do so is especially appalling given the Court's efforts to facilitate settlement. *See* D.I. 445 at 493:2-3.

The only aspects of Serenity's allegations that cannot now be verified by the public record or the personal knowledge of counsel for Ferring are those aspects that specifically relate to conversations between Serenity and Chris Harnett/Jones Day. Based on the level of detail in Serenity's counterclaims, however, these allegations should be easily verifiable. For example, Serenity alleges that "Chris Harnett, then a partner at Jones Day, twice told Serenity that the company had no choice but to pursue those counterclaims because if it did not, Ferring would sue its executives and members personally and 'come after their houses.'" (Ex. C, Counterclaims at ¶ 25.) The fact that Serenity indicates this happened on more than one occasion, and the use of specific quotations in the allegations, supports the veracity of these allegations.

Additionally, details and arguments disclosed in connection with Jones Day's motion seeking to dismiss Serenity's state court counterclaims further support the factual underpinnings of Serenity's allegations. Although Jones Day's original motion papers are not publicly available, Serenity's opposition to that motion and Jones Day's reply in support of the motion are, (*see* Ex. E, Opposition to Mot. To Dismiss; Ex. F, Reply in Support of Mot. To Dismiss), and both indicate that Jones Day does not dispute the allegations concerning Chris Harnett's

response to Serenity's request to dismiss or withdraw the counterclaims against Ferring in this

case. In fact, rather than dispute it, Jones Day appears to have sought to justify and/or rationalize

it. For example, Serenity notes in its opposition that "[i]n support of its advice that Ferring could

come after Serenity's executives if it withdrew its counterclaims in the 201 [sic] Action, Jones

Day cites *Depositors Ins. Co. v. Hall's Rest., Inc.*, 717 Fed. Appx. 653 (8th Cir. 2018), an

unpublished per curiam decision from the federal Eighth Circuit Court of Appeals. Motion at

21." (Ex. E, Opposition to Mot. To Dismiss at 29.) Similarly, Jones Day's reply does not dispute

the facts underlying Serenity's allegations, but rather seeks to rationalize them by suggesting that

"Jones Day provided reasonable settlement advice in May and June 2019." (Ex. F, Reply in

Support of Mot. To Dismiss at 11.) Specifically, with respect to the allegations concerning Chris

Harnett, Jones Day argued:

> Serenity never explains or gives legal authority for why Harnett's
> May 31 advice was incorrect, let alone so unreasonable that it
> amounted to malpractice. (Opp. 34–35.) Strategic litigation advice
> is not malpractice unless it disregards laws or rules that are either
> "elementary or conclusively settled by authority." *Parksville*, 73
> A.D.2d at 600; *Bernstein v. Oppenheim & Co.*, 160 A.D.2d 428,
> 430 (1st Dep't 1990). Serenity does not contest that Ferring was a
> hyperaggressive litigator, that a prevailing party in patent litigation
> can seek attorney's fees, or that Ferring could have attempted to
> pierce the corporate veil to recover attorney's fees. (*See* Mot. 24–
> 25.) Nor does Serenity argue that Harnett was wrong when he
> advised that Fein's settlement proposal "was a problematic
> negotiation strategy." (Mot. 25.) It turns out that Serenity's only
> basis for this theory is a conclusory allegation that Harnett's advice
> was "a baseless and unethical shakedown" (CC ¶ 85), along with
> conclusory assertions that the advice had "little basis" or was
> "baseless" (Mot. 35). Conclusory allegations do not state a claim.

(*Id.* at 12.) It is unclear from this context whether "Harnett's May 31 advice" represents the first

or second communication from Chris Harnett referenced in Serenity's counterclaims (or another

communication entirely), but Jones Day's argument seemingly confirms that Chris Harnett told

Serenity that it could not settle its claims without risking reprisal from Ferring. (*See* Ex. C,

Counterclaims at ¶ 25.) And as explained below, Jones Day's attempt to mitigate Chris Harnett's behavior fails to recognize that his actions—and his failure to listen to his client—resulted in a completely unnecessary trial.

> **b.      Jones Day and Chris Harnett acted unreasonably in failing to abide by their client's decisions concerning the objectives of the representation.**

There was no colorable basis for Jones Day's failure to inform Ferring and/or the Court about Serenity's desire to dismiss their claims, and there was no colorable basis for Chris Harnett's false and unfounded claims to his client that Ferring would pursue legal action against Serenity's executives if Serenity dismissed those claims. In analogous circumstances, district courts in the Second Circuit have found counsel liable for sanctions under § 1927. For example, in *Abraham v. Volkswagen of America, Inc.*, Volkswagen provided settlement offers for each of 51 individual plaintiffs shortly after the court refused to certify a class in an action against Volkswagen. 1991 WL 89917, at *2-3. Rather than conveying those offers to the individuals, however, the attorney representing the plaintiffs rejected the settlements out of hand and did not even tell his client about the settlement offers until several weeks after he had rejected them. *Id.* There, the district court found that because it is the client's—not the attorney's—exclusive authority to accept or reject a settlement offer, counsel's rejection of the proposed settlement was sanctionable. *Id.* at *6.

Here, we initially have the inverse of the situation in *Abraham*, in that Serenity wanted Jones Day to resolve this case by dismissing or withdrawing the counterclaims, but Jones Day refused to convey Serenity's desire to Ferring or the Court. Then, when Ferring indicated that it was willing to allow Jones Day to withdraw as counsel if Serenity withdrew their claims, Jones Day also did not inform their client about Ferring's position. Thus, the overall situation is actually worse than that in *Abraham*; Jones Day was aware that both Ferring and Serenity

separately believed that this case could and should be resolved by dismissing the counterclaims. Rather than effectuate that dismissal, however, Jones Day and Chris Harnett ignored their client's wishes and scuttled any attempt to resolve the case before trial.

Additionally, to the extent that Jones Day and Chris Harnett attempt to avoid sanctions in this case using the same rationalization of Chris Harnett's behavior found in its state court reply brief, even putting aside disagreements with Jones Day's characterizations of certain issues (such as suggesting that Ferring is "a hyperaggressive litigator"), Ferring notes that Jones Day's argument completely misses the point. The issue is not whether, theoretically, Ferring *might* have been able to seek attorneys' fees in this case if it were determined to be the "prevailing party" (as argued by Jones Day); the issue is whether Chris Harnett and Jones Day "abide[d] by [their] client's decisions concerning the objectives of representation," especially with respect to their "client's decision whether to settle a matter." New York Rule of Professional Conduct 1.2(a). Instead of at least exploring whether their client's objective could be accomplished— specifically, whether Ferring would agree not to pursue any motion for attorneys' fees if Serenity dismissed their claims against Ferring with prejudice—Jones Day bullied their client into believing that the only possible course of action was to maintain their suit and proceed to trial.

But there were other options. At a minimum, Jones Day could and should have approached Ferring under the protection of Federal Rule of Evidence 408 to assess whether Serenity could dismiss its claims without fear of reprisal. Jones Day also could have approached the Court, especially given the circumstances surrounding Jones Day's motion to withdraw. Jones Day already had filed numerous papers with the Court regarding Jones Day's "contretemps with [their] client over the fee." (Ex. D., July 12, 2019 Hearing Tr. at 9:10-10:7.) Seemingly, this would have been an ideal time to let the Court know that, in addition to issues concerning

outstanding fees, Serenity did not want to go forward with the trial. Additionally, at the May 3, 2019 pretrial conference, this Court directed both sides to provide *ex parte* letters setting forth the parties' respective positions regarding mediation on May 9, 2019. (Decl. at ¶ 4.) That Jones Day failed to take such an opportunity to raise Serenity's desire to dismiss or withdraw the counterclaims before trial due to concerns about mounting litigation costs—especially when Jones Day also knew that Serenity already was having trouble paying fees it had incurred up to that point—borders on inconceivable. In this context, Jones Day (if it were truly concerned) also could have raised with the Court and sought to extinguish the possibility of Ferring using such a withdrawal to seek its own attorneys' fees. Instead, just as it initially did with the issues related to Jones Day's motion to withdraw as counsel, Jones Day "stood mute and never raised the prospect." (Ex. D., July 12, 2019 Hearing Tr. at 13:21-14:2.)

In any case, once Ferring confirmed that it would not oppose Jones Day's motion to withdraw if the counterclaims were dismissed with prejudice, D.I. 419 at 8, Ferring's actions removed any auspices that Ferring would retaliate against Serenity for doing so. Even then, Jones Day did nothing, which as explained in greater detail in the following section may well have been motivated by a desire to hide its own shortcomings and mistakes from its client. Jones Day's only response to Serenity's allegation that Jones Day failed to inform it of Ferring's offer is to point to an email conveying Ferring's brief to individuals at Serenity. (Ex. F, Reply in Support of Mot. To Dismiss at 12-13.) That email, however, conveyed no substantive information regarding the briefing and did not provide any notification or analysis of Ferring's offer. (Ex. G, Ex. B to Reply in Support of Mot. To Dismiss at 1.) Therefore, Jones Day cannot seriously contend that it made Serenity aware of Ferring's offer or of the fact that Chris Harnett's

14

previous position—to the extent it was even arguably grounded in reality before—was completely undermined by Ferring's position.

### 2. *Chris Harnett and Jones Day acted in bad faith in refusing to allow Serenity to dismiss or withdraw their counterclaims.*

Jones Day's failure to communicate Serenity's desire to dismiss or withdraw their counterclaims to counsel for Ferring, and separately Jones Day's failure to inform Serenity about Ferring's willingness to allow Counterclaimants to dismiss their claims with prejudice, each demonstrates *per se* bad faith on behalf of Jones Day. As explained by the district court in *Abraham*:

> The client's exclusive authority to decide whether to accept or reject an offer of settlement is clear. N.Y.Jur. EC 7–7. An attorney's failure to inform his client that such an offer has been made necessarily denies the client of that right. "No type of misbehavior by an attorney is more universally and categorically condemned, and is therefore more inherently in 'bad faith,' than the failure to communicate offers of settlement." *Deadwyler v. Volkswagen of America, Inc.*, No. ST–C–85–38, slip op. at 24 (W.D.N.C. Jan. 14, 1991); *see also Rizzo v. Haines*, 555 A.2d 58, 66–67 (Pa.1989) (failure to communicated settlement offers is among the few types of misconduct so self-evident that it is unnecessary to establish its improper character). In fact, even arguably less egregious conduct such as foot-dragging and delay in finalizing a settlement agreement has been sanctioned under section 1927. *Forman v. Mount Sinai Medical Center*, 128 F.R.D. 591, 605–06 (S.D.N.Y.1989).

1991 WL 89917, at *6. As noted above, the situation here is actually worse than that in *Abraham*. Jones Day, and specifically Chris Harnett, affirmatively prevented this case from being resolved before trial even though their client asked them to withdraw the only pending claims. Just as Serenity alleges in the state court action, "Jones Day never spoke to Ferring's lawyers about the possibility of settlement of the counterclaims in the 2012 Action before telling Serenity that it had no choice but to pursue those counterclaims." (Ex. C, Counterclaims at ¶ 87.) Instead, Chris Harnett threatened his own client with an entirely manufactured and baseless

allegation that Ferring would retaliate against the principals of Serenity if the claims were dismissed. (*Id.* at ¶¶ 83-85.) Then, when Ferring affirmatively represented to the Court that it would consent to Jones Day withdrawing from the case as long as Counterclaimants dismissed their claims with prejudice—since doing do would resolve the remaining issues in the case without the need for trial—Jones Day did not even convey that information to their client in a meaningful way. (*Id.* at ¶¶ 88-89.)

Bad faith also can be inferred based on Jones Day's apparent incentives not to inform Ferring or Serenity about the other's positions with respect to dismissing the counterclaims in this action. As detailed in Ferring's opposition to Jones Day's motion to withdraw as counsel, and echoed in Serenity's state court claims, Counterclaimants' claims in this case became essentially worthless once Judge Sweet determined that Dr. Fein could not be the sole inventor of Ferring's patents. D.I. 419 at 4-5; (Ex. C, Counterclaims at ¶¶ 40-49, 95). Ferring further explained that the only plausible motive to maintain the counterclaims in this case at that time was the ongoing harassment of Ferring:

> Jones Day's decision to time its motion to withdraw so as to force Ferring to spend as much money as possible is emblematic of the manner in which Jones Day and Counterclaimants have litigated this entire case. The motivation for Counterclaimants to maintain this suit is the ongoing harassment of Ferring, as there are no damages at issue and no apparent financial or business benefits for the continued prosecution of this matter for Counterclaimants. Tellingly, Jones Day is not even asserting a retaining or charging lien in this case. See D.I. 410 at 4 n.3. That is because this case has no value. Even if Counterclaimants succeeded in having Dr. Fein named as a coinventor on the two patents in suit, this Court has already ruled that Dr. Fein cannot be the sole inventor of those patents. D.I. 212. The patents in suit cover Ferring's NOCDURNA® product, but as recorded in the U.S. Food & Drug Administration's Approved Drugs with Therapeutic Equivalents (commonly referred to as the "FDA's Orange Book"), there are five other patents that protect that product in addition to the two patents in suit. Decl. of M. Bourke at ¶ 7. Thus, even if Dr. Fein

> were added as a co-inventor for the two patents in suit, and Counterclaimants obtained Dr. Fein's rights in those patents; not only would Counterclaimants not be able to extract any royalty payments for NOCDURNA® based on the patents in suit (because they would have co- rather than full-ownership over those patents), but also they would not be able to market their own, competing version of NOCDURNA® (because Ferring has other patents listed in the FDA's Orange Book as covering NOCDURNA®).

D.I. 419 at 4-5. Of course, at that time, Ferring did not know that Serenity had already asked Jones Day to withdraw or dismiss the counterclaims, but Jones Day had refused to do so. In fact, by the time Serenity expressed concerns about the mounting costs of going to trial and asked Jones Day to dismiss or withdraw the counterclaims, Jones Day had already spent years and billed significant fees litigating claims that had no real value to their clients. *See id.* Apparently, however, Jones Day never informed Serenity of these limitations. (*See* Ex. C, Counterclaims at ¶¶ 43-49.)

In this context, Jones Day's failure to inform Serenity that Ferring would be amenable to Jones Day's withdrawal if the counterclaims were dismissed with prejudice seems to have been an attempt to cover up their prior failings. If Jones Day were simply looking to withdraw, then Ferring's offer—coupled with their client's expressed desire to dismiss or withdraw those claims—would seemingly resolve all issues. Thus, the fact that Jones Day did not communicate these developments to their client is telling. Presumably, Jones Day recognized that doing so would expose either (1) that Chris Harnett fabricated any supposed retaliation by Ferring in response to dropping the counterclaims and/or (2) that Jones Day had billed millions of dollars maintaining those claims even after they had been rendered essentially worthless by Judge Sweet's 2016 summary judgement decision. Either scenario would have had a drastic impact on Jones Day's prospects of recouping the more than $4 million in attorneys' and experts' fees that were already outstanding at that time. (*See* Ex. D., July 12, 2019 Hearing Tr. at 7:16-20.) And as

Chris Harnett told the Court at the hearing on the motion to dismiss, "[he] wanted to be paid, and [he] wanted to finish the lawsuit and win it." (*Id.* at 11:19-14:23.) This desire apparently outweighed Chris Harnett's and Jones Day's obligations to their client and to the Court. *See* New York Rule of Professional Conduct 1.2(a).

### B.      Amount of Sanctions

Based on facts that have come to light in connection with Serenity's allegations in its state court counterclaims, it is clear that this case never should have gone to trial. The only remaining claims at the time of trial related solely to Counterclaimants' attempts to have Dr. Fein named as a co-inventor on Ferring's patents, and Serenity tried to get Jones Day to withdraw or dismiss those claims before trial. Thus, at a minimum, Ferring should be able to recover its costs, expenses, and fees associated with preparing for and participating in the July 2019 trial.

Ferring currently does not have information concerning exactly when Serenity informed Jones Day that they wanted to withdraw the counterclaims, other than that it was no later than May 2019. (*See* Ex. F, Reply in Support of Mot. To Dismiss at 11.) But even looking at just the time period following Ferring's opposition to Jones Day's motion to withdraw, wherein Ferring indicated that it would not oppose Jones Day's motion if the counterclaims were dismissed, Ferring incurred well over one million dollars in attorneys' fees, expenses, and costs associated with the July 2019 trial during that time. To be clear, Ferring believes that this represents the floor of the amount for which Jones Day and Chris Harnett should be sanctioned.

## V.      CONCLUSION

For the reasons herein, Ferring respectfully requests that the Court sanction Jones Day and Chris Harnett for conduct that required the Court and Ferring to expend resources on a trial that Jones Day's own client did not even want to pursue, and Ferring respectfully requests that

the Court find Jones Day and Chris Harnett jointly and severally liable for the full amount of sanctions.

With respect to the specific amount of sanctions, many of the filings in the state court action between Jones Day and Serenity remain sealed, and Serenity's counterclaims do not make it clear when Serenity first approached Jones Day about dismissing or withdrawing the counterclaims in this case. Therefore, to the extent that the Court determines Jones Day's and/or Chris Harnett's actions in this case are sanctionable, Ferring respectfully requests an opportunity to provide additional materials concerning the amount of sanctions to be imposed. To the extent such information does not come to light during the briefing of this issue, certain limited discovery may be required regarding the timing of Serenity's communications to Jones Day.

Ferring also respectfully requests any additional relief the Court determines to be just and proper.

Dated: March 5, 2021                              Respectfully submitted,

                                                  s/ *Mary W. Bourke*
                                                  Mary W. Bourke
                                                  Dana K. Severance
                                                  Womble Bond Dickinson (US), LLP
                                                  1313 North Market Street, Suite 1200
                                                  Wilmington, DE 19801
                                                  Telephone: (302) 252-4320
                                                  Mary.Bourke@wbd-us.com
                                                  Dana.Severance@wbd-us.com

                                                  Joshua P. Davis
                                                  Womble Bond Dickinson (US), LLP
                                                  811 Main Street
                                                  Suite 3130
                                                  Houston, TX 77002
                                                  Telephone: (346) 998-7801
                                                  Joshua.P.Davis@wbd-us.com

John W. Cox
Womble Bond Dickinson (US), LLP
271 17th Street NW, Suite 2400
Atlanta, GA 30363
Telephone: (404)-872-7000
John.Cox@wbd-us.com

*Attorneys for Plaintiffs/Counterclaim-Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed using this Court's CM/ECF notification service, which sent notification of such filing to all counsel of record. I certify that a copy of the foregoing was provided to the following non-registered participants in the manner indicated:

**Via E-mail**
Michael R. Shumaker
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001-2113
mrshumaker@jonesday.com

**Via E-mail**
Leon F. DeJulius Jr.
JONES DAY
250 Vesey Street
New York, NY 10281-1047
lfdejulius@jonesday.com

**Via USPS Overnight Delivery
with Proof of Service**
Serenity Pharmaceuticals, LLC
c/o Registered Agent
Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

**Via USPS Overnight Delivery
with Proof of Service**
Reprise Biopharmaceutics, LLC
120 North Main Street, Suite 400
New City, NY 10956

Dated: March 5, 2021

_s/ Mary W. Bourke_
Mary W. Bourke